**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN W. CREAMER,<br><br>  Plaintiff,<br><br>  v.<br><br>JAMES P. LYNCH, et al.,<br><br>  Defendants. | Civil Action No. 07-631 (KMW) (MJS)<br><br>**OPINION** |

**WILLIAMS**, District Judge:

This matter comes before the Court on Defendants' Motions seeking Summary Judgment in this prisoner civil rights matter. (ECF Nos. 125-26.) Plaintiff filed a response to the motion (ECF No. 131), to which Defendants replied. (ECF No. 132.) Plaintiff also submitted an improper sur-reply without first seeking leave of court. (ECF No. 134.) For the following reasons, Defendants motions shall be granted, and judgment shall be entered in favor of all Defendants.

**I.   BACKGROUND**

Plaintiff's current complaint arises out of events which occurred on March 20, 2006, while he interacted with various police and prosecutor's office staff following his attempt to report a dead body in his apartment. (*See* ECF No. 1.) The confession which resulted from Plaintiff's interview on that day resulted in Plaintiff being convicted of charges including aggravated manslaughter and hindering prosecution. (ECF No. 125-4 at 36.) In affirming Plaintiff's

convictions, the Appellate Division of the Superior Court of New Jersey summarized the factual background of that conviction as follows:

> At [Plaintiff's] trial, the State presented evidence which established that on March 20, 2006, [Plaintiff] walked into Oaklyn police headquarters and claimed he suspected there was a dead body in his apartment in Gloucester City. [Plaintiff] consented to a search of his apartment and his garbage. Officers from the Gloucester City Police Department entered [Plaintiff]'s apartment and found the dead body of Lisa Hoopes . . . lying on the couch, covered with a blanket, with duct tape around her neck. Hoopes and the couch were covered in blood, and there was a considerable amount of blood in the apartment.
>
> The police found a bloody pair of scissors, a trash bag full of clothes in the oven, and a bloody hammer inside the microwave. Around ten o'clock that morning, [Plaintiff] was taken to the offices of the Camden County Prosecutor, where he was questioned by investigators John Greer and James Bruno, and Detective Mark Ridge. [Plaintiff] was informed of his *Miranda* rights.[] He signed a written waiver of those rights.
>
> [Plaintiff] told the investigators that, on the previous Friday, March 17, 2006, he ingested cocaine in his apartment with Karen Ann Sluzalis (Sluzalis) and Brian Springer (Springer). At some point, Mark Berky (Berky), a person [Plaintiff] knew from the neighborhood, arrived and Springer left. Later that night, [Plaintiff] and Berky left the apartment to purchase liquor, leaving Sluzalis alone. While [Plaintiff] and Berky were out, they met Hoopes, who returned to the apartment with them. Hoopes, Berky, and Sluzalis later left.
>
> Very early on Saturday, March 18, 2006, Berky returned to [Plaintiff]'s apartment and asked [Plaintiff] to bring Sluzalis's car to her with 'two bags of dope and $20.00[.]" When [Plaintiff] arrived at Sluzalis's apartment, she was upset. She said that Berky and Hoopes had "played" him. [Plaintiff] and Sluzalis then "started shootin' some coke[.]"
> At some point, Sluzalis called Hoopes and arranged to meet her at [Plaintiff]'s apartment. Sluzalis went to meet Hoopes later Saturday morning. When she returned, she had blood on her hands and appeared disheveled. [Plaintiff] asked what happened but did not press her. He remained at Sluzalis's apartment until she kicked him out early Monday morning, at which point he went to the police, as he said "to cover [his] ass[.]"

[Plaintiff] told the investigators that Sluzalis had "some type of" altercation with Hoopes in his apartment on Friday night, and he was concerned that if he went home, he would be "walking into . . . something" that he was not "aware of" and which he wanted "no part of." After about an hour, [Plaintiff] invoked his right to counsel and his right to remain silent. The interview ended. [Plaintiff] was placed under arrest. He was required to remove his boots before being placed in a holding cell. After observing bloodstains on [Plaintiff]'s boots, the investigators obtained a warrant to seize the [Plaintiff]'s boots and clothing. On March 20, 2006, the investigators obtained DNA samples from [Plaintiff] and Sluzalis.

Later that day, [Plaintiff] told the investigators he wanted to provide them with more information, but said that he did not want to speak with Greer, Bruno, or Ridge. Around 5:30 p.m., Investigators Eric Wren and Diane Wilson interviewed [Plaintiff]. Before that interview, [Plaintiff] was again informed of his *Miranda* rights, and he again signed a waiver of those rights.

In his second interview, [Plaintiff] said that on March 18, 2006, he was in his apartment with Springer and Sluzalis, when Sluzalis invited Hoopes to the apartment. Hoopes arrived and, at some point thereafter, [Plaintiff] was with Springer in the kitchen when they heard a commotion in the living room. They found Sluzalis and Hoopes engaged in a physical altercation.

[Plaintiff] stated that "somebody had a knife[.]" It was a four-inch, camouflage, switchblade that Sluzalis always carried. He said that he initially thought Springer was trying to pull the two women apart, but then he realized that Springer was also hitting Hoopes. According to [Plaintiff], Sluzalis pulled a hammer from his tool box and struck Hoopes with it. Springer then did the same.

[Plaintiff] claimed that he did not participate in the attack but saw that Hoopes was suffering and attempted to "put her out of her misery" by "stomp[ing] her one time[,]" like he had once done with an injured baby bird. [Plaintiff] stated that, despite the injuries, Hoopes managed to pull herself onto the couch.

[Plaintiff] did not attempt to help Hoopes because he "felt a little bit threatened[,]" by Sluzalis and Springer. After the attack, [Plaintiff], Sluzalis and Springer put the hammer in the microwave and poured bleach on the knife before throwing it into the trash dumpster. After the second interview, [Plaintiff] was transported to a hospital because of complications from diabetes.

. . . .

[On appeal, Plaintiff] argue[d] that the court erred by admitting the statements that he made at his second interview with the prosecutor's office. We do not agree.

. . . .

Here, the record indicates that [Plaintiff] voluntarily appeared at the Oaklyn police station and reported that there may be a dead body in his apartment. The police went to the apartment and found Hoopes's body. It appeared that she had been murdered. The police transferred [Plaintiff] to the prosecutor's office. He was left alone in an interview room for approximately two hours and provided with food before being interviewed. The interview continued for about one hour, until sometime around 1:30 or 1:45 p.m., when [Plaintiff] invoked his right to counsel.

The questioning stopped. The investigators asked [Plaintiff] whether he wanted something to eat or drink, and [Plaintiff] asked for "a little lunch[.]" [Plaintiff] is a diabetic. The investigators also asked him if he needed a dose of insulin. Thereafter, [Plaintiff] was left alone for approximately four hours and no one spoke with him about the case.

[Plaintiff] was provided with access to a restroom during that period. Around 5:15 p.m., Investigator Wren checked on [Plaintiff] before leaving the office for the evening. [Plaintiff] asked for a cop of coffee and a cigarette, which were provided to him. He was allowed to use the restroom. As [Plaintiff] was returning to the holding cell from the restroom, he told Wren that he "ha[d] some details I want to fill you in on."

Wren offered to get the investigators who previously interviewed [Plaintiff] but [Plaintiff] expressed a preference to speak to Wren claiming that "I didn't like the other two investigators. They kept asking me the same questions over and over again and they made me feel like I was a liar . . . ."

[Plaintiff] was again advised of his *Miranda* rights. He interrupted the recitation of rights, seeking assurances that he could stop the interview if he pleased "like I did the other time." [Plaintiff] agreed to waive his rights and the second interview followed.

[Plaintiff] argues that the offers to provide food or drink, and the inquiries concerning his medical needs, were an attempt by the investigators to pressure him to revoke his assertion of his right to counsel and "break down his will[.]" The trial court found,

4

> however, that [Plaintiff]'s statement "was completely voluntary with full understanding of his rights without any coercion."

(ECF No. 125-4 at 35-38.)

After both the trial and appellate courts rejected Plaintiff's claim that his confession had been coerced by police through manipulation of his diabetes, he raised that claim once again during his post-conviction relief proceedings, arguing that trial counsel should have more forcefully argued that diabetic complications which ultimately led to his hospital admission, and not his free will, gave rise to his confession. (*See* ECF No. 125-4 at 46.) Both the trial and appellate post-conviction relief courts rejected this claim, noting that the record indicated that Plaintiff had been repeatedly offered food, drink, and bathroom use, and had been offered insulin in the early afternoon at the start of his first interview. (*Id.* at 47.) The PCR courts also noted that, prior to the second interview, Plaintiff was told that "he would be taken to the hospital for insulin if and when he needed it" and "did not at any time lose his focus or ability to understand" during his two interviews. (*Id.*, internal quotations omitted.) The PCR courts also found relevant the fact that Plaintiff received medical assistance immediately after his second interview, and that although he was hospitalized for a few days thereafter due to his elevated blood sugar levels, Plaintiff told medical staff that he was feeling "back to normal" the day after the interviews. (*Id.*). The PCR courts also observed that Plaintiff does not take regular insulin doses, but instead "only takes insulin when he does not feel well and only when he wants to do so." (*Id.*)

During his habeas proceeding in this Court before Judge Bumb, Plaintiff reiterated this coerced confession claim. (*See id.* at 54-55.) In raising the claim in his habeas petition, Petitioner admitted that he arrived of his own volition at the Oaklyn police department at approximately 7 a.m. on the date in question, consented to the search of his apartment, and was taken to the Gloucester City Police Department based on the location of his apartment. (*Id.* at 70.) He was not

5

restrained at this time. (*Id.*) He was thereafter taken to the prosecutor's office for an interview at 10:16 a.m. and provided with food and drink before being left alone in a conference room to await an interrogation. (*Id.*) At approximately 12:26 p.m., an interview began, which lasted for about an hour. (*Id.*) By Petitioner's own admission, "during the first interview [investigators] asked [him] if he required insulin which Petitioner declined." (*Id.* at 72.) Although Plaintiff maintained that he only gave his second statement because he was ill and needed treatment, he also admitted in his habeas petition that, following the second interview, he was taken "to the emergency room immediately" and received treatment for his diabetes. (*Id.*) Plaintiff's admissions in his habeas petition thus indicate that he arrived at the police station at 7 a.m., was taken to the Gloucester police just after 10 a.m., and was then taken to the county prosecutor's office. He was offered and received food and drink during that time. His petition also establishes that he was offered, and refused, insulin at or around 1 p.m., and ultimately received medical attention for elevated blood sugar shortly after the second interview concluded in the late afternoon/early evening. Judge Bumb rejected Plaintiff's habeas claims, finding that the state courts' conclusions were well supported by the record and not contrary to federal law, and that he failed to present any evidence that he had been coerced. (*Id.* at 55-56.)

## II. **LEGAL STANDARD**

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is

material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

> "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial."

*Serodio*, 27 F. Supp. 3d at 550.

### III. DISCUSSION

In their motions, Defendants contend that they are entitled to judgment as a matter of law because Plaintiff has failed to show that they were deliberately indifferent to his medical needs, they are entitled in any event to qualified immunity, and finally because Plaintiff's claims are barred by *Heck v. Humphries*, 512 U.S. 477, 486-87 (1994), and its progeny. Initially, the police

officer Defendants – those who were only involved with Plaintiff *prior* to his transfer to the prosecutor's office and thus had no interaction with Plaintiff after he was restrained from leaving and ultimately arrested – contend that they are entitled to summary judgment on Plaintiff's medical claims because they were not under any constitutional obligation to provide Plaintiff with medical services notwithstanding any requests for aid. "The Due Process Clause of the Fourteenth Amendment does not impose an affirmative right to governmental aid . . . even where such aid may be necessary to secure life, liberty, or [a] property interest of which the government itself may not deprive the individual." *Hottenstein v. City of Sea Isle City*, 977 F. Supp. 2d 353, 363 (D.N.J. 2013) (quoting *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 196 (1989)). There is thus no right to medical assistance unless and until either the state creates the danger imposing the medical risk at issue or a "special relationship" – such as an arrest or involuntary confinement – arises. *Id.*

The record in this matter, developed extensively at Plaintiff's criminal suppression hearing, indicates that Plaintiff was not restrained nor placed in a secure portion of the police station in either Oaklyn or Gloucester City. Indeed, he reported to Oaklyn himself. As such, during his time in the two police departments, no "special relationship" existed which would mandate that the police provide Plaintiff medical attention as they were not, at that time, holding him against his will. *Id.*; *see also Morrow v. Balaski*, 719 F.3d 160, 167-68 (3d Cir. 2013) (it is the restraint on an individual's liberty, and not any police knowledge of a medical issue, that mandates protective action under the Fourteenth Amendment). As the police defendants were not constitutionally required to render aid to Plaintiff, his claims against them fail as a matter of law, and they are entitled to summary judgment.

The remaining Defendants contend that they are entitled to summary judgment because, even following restraints being placed on Plaintiff's ability to leave once his first interview began,

8

the record developed in the criminal matter and Plaintiff's own admissions in his habeas petition clearly indicate that they were not deliberately indifferent to his medical needs. Under the Due Process Clause of the Fourteenth Amendment, a restrained or incarcerated individual seeking to raise a claim for inadequate medical care must show that the defendants were deliberately indifferent to his medical needs in order to be entitled to relief. *See Natale v. Camden County Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003). A deliberate indifference claim thus has two chief elements: the plaintiff must show that he had a sufficiently serious medical need and that the defendants committed acts or omissions which are indicative of deliberate indifference to that need. *Id.* Deliberate indifference is a "subjective standard of liability consistent with recklessness" which will be found only where the defendant "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 582 (internal quotations omitted). Deliberate indifference therefore "requires more than inadequate medical attention or incomplete medical treatment," *see King v. Cnty. of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008). Not all medical needs are so serious that the constitution demands that they receive immediate attention. An individual's need will only be sufficiently serious to support a constitutional claim where the need "has been diagnosed as requiring treatment or is so obvious that a lay person would easily recognize the necessity of a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert denied*, 486 U.S. 1006 (1988).

Even if the Court assumes, *arguendo*, that Plaintiff's alleged pressing need for insulin was, at the time of his interviews, so pressing as to amount to a serious medical issue requiring treatment,[1] it is clear that Defendants are entitled to judgment as a matter of law because they

---

[1] While the Court accepts that diabetes is a serious illness, and a knowing disregard of a need for prescribed insulin can certainly support a deliberate indifference claim, *see, e.g., Natale*, 318 F.3d at 582-83, the Court is compelled to note that Plaintiff in this matter freely accepted food and drink, turned down insulin when offered, and was noted both during his interviews and upon arriving at

9

were clearly not deliberately indifferent to Plaintiff's needs. Throughout his time with the police and prosecutor's office, Plaintiff was repeatedly offered and received food, water, and use of the bathroom. In the early afternoon, he was, by his own admission in his habeas petition, offered a dose of insulin, which he flatly refused. Plaintiff was likewise told by prosecutor's staff that, when he needed it, he would be transported to the hospital to receive insulin. Indeed, this is exactly what happened when his second interview – the transcript of which clearly shows that investigators were mindful that Plaintiff needed to use the restroom frequently and would eventually need to receive insulin – concluded, Plaintiff was transported directly to the hospital where he received treatment for his medical issues. The record produced in Plaintiff's criminal proceedings, and Plaintiff's own admissions in his habeas petition thus clearly show that Defendants were attentive to Plaintiff's needs – they asked him if he needed insulin, he refused, and they transported him to the hospital when it became clear he was in need of medical attention following the second interview. Given that there are no allegations that any of the involved Defendants had any specialized medical training or knowledge, it cannot be said that Defendants were deliberately indifferent in light of these facts. The record thus clearly shows that Defendants are entitled to judgment as a matter of law, and judgment must therefore be entered in the favor of the prosecutor office Defendants.[2] Because all Defendants are clearly entitled to judgment as a matter of law as they were either not

---

the hospital to be well oriented to his surroundings and occurrences, suggesting that it was not entirely obvious that Plaintiff had a dire or pressing need for insulin during the hours in question. As it is clear that the prosecutor's office defendants were not deliberately indifferent to Plaintiff's needs, however, this Court need not resolve this issue for the purposes of this opinion.

[2] Two Defendants, Acting Prosecutor Lynch and Acting Assistant Prosecutor Smith, argue that they are also entitled to judgment as Plaintiff's claims against them are based solely upon their supervisory roles over the other Defendants. As § 1983 does not permit vicarious liability claims, *see Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015), and as it clear that Defendants were not deliberately indifferent to Plaintiff's claims, Defendants Lynch and Smith are entitled to summary judgment even if Plaintiff's claims against them are not entirely premised on their supervisory roles.

deliberately indifferent to Plaintiff's needs or not under constitutional compulsion to provide medical assistance, this Court need not address Defendants' arguments that they are entitled to qualified immunity or that Plaintiff's claims are *Heck* barred.[3]

## IV. CONCLUSION

In conclusion, Defendants' Motions for Summary Judgment (ECF Nos. 125-26) are granted, and judgment shall be entered in favor of all Defendants. An appropriate order follows.

Hon. Karen M. Williams,
United States District Judge

---

[3] Although the Court need not reach the *Heck* issue, the Court does note that Defendants have presented a compelling argument for the conclusion that Plaintiff's medical claims would be barred in this instance. Under *Heck* and its progeny, "a . . . prisoner's [civil rights] action is barred (absent prior invalidation [of his period of detention]) – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal [disciplinary] proceedings) – *if* success in that action would necessarily demonstrate the invalidity of the confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). Here, Plaintiff contends, as he did in the criminal court and on habeas review, that he was purposely denied medical treatment *for the purpose* of compelling a confession, a confession which ultimately led to his conviction. While that confession was not the only evidence of Plaintiff's guilt – the victim was discovered in his apartment, and her blood was upon his clothing and boots – it was certainly strong evidence of his guilt which doubtless had an effect upon the outcome of his jury trial. Because Plaintiff's claim rests on the idea that he was denied medical treatment, and that this denial was both for the purpose of leading to his confession and ultimately did lead to his confession, it certainly appears that success on his current claims, had they not been clearly without merit, would have impugned the validity of his conviction. Thus, had Plaintiff's claims had merit, they would almost certainly be barred by *Heck* and its progeny absent the prior invalidation of his conviction.